**NORTH AMERICAN PHILIPS COMPANY, Inc., and U. S. Philips Corporation, Plaintiffs,**

v.

**STEWART ENGINEERING COMPANY, Watkins-Johnson Company, and Spectra-Mat, Inc., Defendants.**

**Civ. A. No. 42811.**

United States District Court,
N. D. California.

July 10, 1970.

Mellin, Hursh, Moore & Weissenberger, Jack E. Hursh, San Francisco, Cal., Connolly, Bove & Lodge, Arthur G. Connolly, John D. Fairchild, Wilmington, Del., Jack Oisher, North American Philips Co., Inc., Briarcliff Manor, N. Y., for plaintiffs and counterclaim defendants.

Flehr, Hohbach, Test, Albritton & Herbert, Aldo J. Test, San Francisco, Cal., for defendants Stewart Engineering Co., Inc. and Watkins-Johnson Co.

Limbach, Limbach & Sutton, George C. Limbach, Karl A. Limbach, San Francisco, Cal., for defendant and counterclaim plaintiff Spectra-Mat, Inc.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

ZIRPOLI, District Judge.

After consideration of the entire record herein and the final arguments of counsel, the Court makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. Plaintiff, U. S. Philips Corporation (hereinafter Philips), is a corporation of Delaware with offices at 100 E. 42nd Street, New York, New York. It acquired the sole title to the three patents in suit from the original plaintiff, North American Philips Company, Inc., and was thereafter added as a party plaintiff. [Pre-Trial Order, Admitted Facts Section (6), paras. 1, 4, 6, Order for Addition of Parties dated Oct. 7, 1969; Stipulation filed August 20, 1969]

2. Defendant Watkins-Johnson Company (hereinafter Watkins-Johnson), is a corporation of California with offices at 3333 Hillview Avenue, Palo Alto, California. It is the successor by merger of defendant, Stewart Engineering Company. [Pre-Trial Order, Admitted Facts Section (6), para. 2; Order for Addition of Parties dated Oct. 7, 1969; Stipulation filed August 20, 1969]

3. Defendant, Spectra-Mat, Inc. (hereinafter Spectra-Mat), is a corporation of California with offices at 1240 Highway 1, Watsonville, California 95076. [Pre-Trial Order, Admitted Facts Section (6), para. 3]

### A. Nature of Action

4. This action is for infringement of U. S. Patents No. 2,700,000 entitled "Thermionic Cathode and Method of Manufacturing Same" ('000 patent), 2,700,118 entitled "Incandesible Cathode" ('118 patent), both issued January 18, 1955, and 3,201,639 entitled "Thermionic Dispenser cathode" ('639 patent), issued August 17, 1965. All three patents relate to tungsten dispenser cathodes, and the '000 and '639 patents also relate to methods for their manufacture. Spectra-Mat has been manufacturing and selling tungsten dispenser cathodes in the State of California and elsewhere since its formation in 1963. Watkins-Johnson, and Stewart Engineering Company before it, have been making and selling, for non-government as well as government end use, in the State of California and elsewhere, electron tubes which include tungsten dispenser cathodes purchased from Spectra-Mat. [Pre-Trial Order, Admitted Facts Section (6); paras. 4, 6, 14, 34, 35; PX–2, –3, –4; Cronin Tr. 1240–54]

5. In its simplest form, a "cathode" is an electrode sealed in an electron tube and essential for its operation. When the tube is operating, heat is provided to generate electrons from the cathode. These electrons under the influence of suitable voltages then travel through the tube to another electrode called an anode. The impregnated tungsten dispenser cathodes involved in this litigation are generally used in highly sophisticated microwave vacuum tubes, such as magnetron tubes, traveling wave tubes, backward wave oscillator tubes and klystron tubes. These tubes are widely used in radar systems and for communication, identification, testing and other purposes. The cathode has been referred to as "the heart" of microwave tubes such as magnetrons. [Rittner Tr. 68–70, 244–6; Nowogrodzki Tr. 429–31, 441–3, 449, 451; Cronin Tr. 1226; PX–1F, –44]

### B. Scope and Content of the Prior Art

6. The pre-1950 cathodes other than pure metal emitters can be conveniently grouped or categorized in two main classes (a) non-dispenser cathodes and (b) dispenser cathodes. These classes are quite different from one another in structure, mode of operation and uses. [Rittner Tr. 75, 112–6; PX–12B]

### 1. Non-dispenser cathodes

7. Non-dispenser cathodes are characterized by a short processing heat treatment significantly above the prescribed operating temperature of the cathode. This "shot of heat" causes a chemical reaction which generates— once and for all—the activator. Thereafter, this activator must be available throughout the cathode's useful life. There are two subclasses of non-dispenser cathodes: (1) thoriated tungsten cathodes developed about 1913 by Irving

Langmuir, and (2) oxide-coated cathodes developed about 1904—each of which has been used for many years despite serious shortcomings. [Rittner Tr. 76–9; PX–12C, –12A]

8. The thoriated tungsten cathode is generally made from a tungsten wire or filament activated by an extremely thin layer of thorium formed by the reaction of thorium oxide and tungsten. These cathodes can only be operated at high temperatures from 1600° to 1900°C. But it is not feasible to construct heaters capable of maintaining the emitting surface at these temperatures, so thoriated tungsten cathodes are only used in the form of filaments which are heated by passing current directly through the filament. At the usual operating temperature of these cathodes, there is no significant chemical reaction between the thorium oxide and the tungsten, so their principal activation must occur before the tube is put into operation by a flash or shot of heat at about 2200°C. If the thorium activator is lost during operation of these cathodes, it cannot be regenerated at the normal operating temperature. [Rittner Tr. 76; PX–12C, –17]

9. The oxide-coated cathode generally consists of a thick coating of barium-strontium oxide on a nickel support. It can be made only in limited shapes and dimensions because of drawbacks due to its manufacture by spraying or otherwise depositing a layer of oxide over its entire supporting metal base. These cathodes cannot be made in intricate, specially curved shapes with dimensions to close tolerances, and they cannot be made with emitters of either very small or very large areas. In addition, being a semi-conductor type of emitter, as contrasted to a metal emitter, it has a relatively low direct current (D.C.) emission capability which is inadequate for most microwave tubes. [Rittner Tr. 115–8, 164–5; Kelley Tr. 670–2; Cronin Tr. 1214; PX–12A, –13, –14, –15, –16, –43]

10. Oxide-coated cathodes are so different from dispenser cathodes in structure, mode of operation and properties that oxide cathode prior art was of no help whatever in solving the problems which confronted the patentees of the patents in suit. Although this and other prior art was available to Spectra-Mat's president and his associates when they were attempting to duplicate the Philips impregnated cathode, it is abundantly clear from the record that they received no help from it. [Cronin Tr. 1089–90; Rittner Tr. 111–3, 115–6, 359; Kelley Tr. 955; Nowogrodzki Tr. 507]

11. Oxide-coated cathodes to this day are used commercially where low emission is required, and they are beset with many well recognized problems of long standing. The first problem is the destructable nature of the cathode's active surface from which the electrons are emitted. This is a particularly serious difficulty when the cathode is subjected to bombardment by ions and electrons resulting in harmful physical and chemical changes in its emitting surface. This bombardment physically dislodges sections of the oxide coating thus destroying the emitting surface, since the oxide cathode is incapable of regenerating these lost oxide sections at normal operating temperatures. Bombardment also results in loss of the activator due to undesirably rapid evaporation. [Rittner Tr. 153–7, 159–65, 247; Nowogrodzki Tr. 452]

12. Another major problem of oxide-coated cathodes is their limited D.C. emission capability, which makes them unsuitable for use in many tubes. This is attributable to the semi-conductor nature of the oxide coating from which the electrons are emitted and which contains only a limited number of free electrons. Oxide cathodes are usually incapable of emitting more than about one-half ampere per square centimeter on a continuous basis. If attempts are made to operate them at a higher emission level for a long period of time, for example longer than 1/1,000,000 of a second, the current thereafter falls off to a much lower level. [Rittner Tr. 111–3, 115–7, 162–5; Nowogrodzki Tr. 456]

## 2. Dispenser cathodes

13. Dispenser cathodes operate on an entirely different principle from the non-dispenser cathodes described above. As explained by Dr. Rittner, dispenser cathodes are characterized by a progressive chemical reaction which occurs at the cathode's normal operating temperature and continuously dispenses a small amount of an activator to the tungsten emitting surface, where it reduces the tungsten's work function and thereby increases its electron emission. The high electron emission from the dispenser cathode is caused by a dipole layer of barium on oxygen on the tungsten metal base, which is heated to temperatures in the range of 950° to 1100°C. The emission comes from "large reservoirs of electrons" in the tungsten metal. Though the barium, in the form of a monatomic layer, is tenaciously bound to the tungsten surface, barium atoms as well as barium oxide molecules are lost during cathode operation due to evaporation and bombardment by ions or electrons. However, the emitting characteristics of these cathodes are preserved for many thousands of hours because new barium and barium oxide is being continuously dispensed to the emitting surface from the network of pores within the tungsten. There are two subclasses of dispenser cathodes: (1) the cavity type originated at General Electric during the 1930's and brought to limited commercial fruition by development of the "L" cathode in Europe in the late 1940's, and (2) the non-cavity intimately mixed types of the 3 patents in suit, developed by Philips in the U. S. during the early 1950's. [Rittner Tr. 111–3, 115–6, 182; Kelley Tr. 871; PX–43]

14. The earlier dispenser cathodes, resulting from the extensive work of the General Electric Company, employed a metal cage containing a mass of material from which the activator was derived. The Hull cathode had separate emitting vanes to achieve some degree of control over the temperature of the dispenser and the temperature of the emitting surface, which was complicated and impractical. In the Francis and Lafferty cathodes, the cage itself served as the emitting surface by making it in the form of a helical wire structure. But these cathodes also had serious drawbacks which rendered them impractical for commercial purposes. [Rittner Tr. 165–9, 173–4, 176–8; PX–11L, –11V, –12, –12E; DX–183, Navias p. 37]

15. The "L" cavity cathode located the mass of mixed carbonate material from which the barium activator was derived in an isolated cavity behind a porous wall of tungsten. It achieved some limited commercial use in Europe, but was subject to difficulties because of its welded construction, excessive loss of activator, the long time required for activation, and the limited shapes and sizes that could be made. [Rittner Tr. 183, 190–3; PX–11K, –12F, –18, –19, –20]

16. The unsolved problems of the pre-1950 cathode art were directly responsible for many long-recognized restrictions on the design of sophisticated electron tubes. During and after the Second World War, there was a long period when tube designers were unable to produce vacuum tubes having all the properties required for advanced radar and other sophisticated systems. Substantial advances had been made in the other elements of these tubes, but the stumbling block to the achievement of new and better tubes was the need for an improved cathode. Many large organizations such as Columbia Radiation Laboratories, M.I.T., Westinghouse, R.C.A. and others were carrying out extensive research and development programs to fill this need, but "the cathode was the element that they couldn't crack until the * * Philips impregnated" cathode came on the horizon. [Rittner Tr. 265–6; Nowogrodzki Tr. 453–4, 457–8, 515]

17. The Raytheon Company, a major United States electronics company which had contributed many improvements in magnetron tube design, had been engaged in a cathode development program since the late 1940's. Spectra-Mat's president, Leo J. Cronin, was at that

time a member of a group of Raytheon scientists seeking to develop a cathode suitable for general use in the newer microwave tubes. This group had more than ordinary skill in the cathode art. Cronin was a chemical engineer with many years experience in cathodes. One of his associates was R. Dyer, a chemist. Another was K. Dudley, an electrical engineer. They and other specialists in metallurgy, ceramics, cathodes and ceramic-metals worked together making, testing, changing and retesting numerous cathodes. In early 1953, they learned of Philips' new impregnated cathode, and were impressed by its unusual design and properties. [Cronin Tr. 1106–14; Nowogrodzki Tr. 503; PX–37–9]

18. Dr. Roberto Levi, one of the Philips inventors, had published in February 1953 in the "Journal of Applied Physics" a description of the new impregnated dispenser cathode. Shortly thereafter, Raytheon purchased four of these new cathodes from Philips. Cronin and his associates were aware from the Levi article that unlike prior cathodes, this one had a porous tungsten matrix which had been machined to the proper dimensions and then impregnated with barium aluminate. But they did not know how Philips made the barium aluminate, or how the pores of the tungsten matrix were impregnated with this material. After extensive analysis of the Philips cathodes, they then sought to determine how Philips made the barium aluminate and impregnated it into the porous tungsten matrix in a concentrated effort to "duplicate" the Philips cathode. [Pre-Trial Order, Section (6), para. 7–9; Cronin Tr. 1109–13, 1128–29, 1192; PX–36, –39, p. 65]

19. Cronin and his associates experimented with many chemicals for making barium aluminate and with many techniques for impregnating porous tungsten, but it was not until mid-September, 1953, that they finally succeeded in making the cathode. The prior art was of no help whatever to them. Even though they knew from Dr. Levi's publication in

February 1953 (after the '118 and '000 patent applications had been filed) that the improved Philips' cathode consisted of porous tungsten "impregnated" with "a mixture of normal and basic barium aluminates", and even though they had obtained and thoroughly analyzed a number of these impregnated cathodes, it still took them some six months of extensive and frustrating experimentation involving one failure after another to complete the cathode. [Cronin Tr. 1107–14, 1137–44, 1148–71, 1178; PX–37–9]

20. Cronin and his team continued to work with these cathodes through 1953 and 1954. Throughout this period, they were unaware that the emissive properties of the impregnated cathode could be dramatically improved by the addition of calcium-oxide to a barium-aluminate impregnant containing more than 1 mole of BaO for each mole of $Al_2O_3$. Cronin had never tried this, and his first awareness of this surprising phenomenon came from a technical paper published in May, 1955, by Dr. Levi, inventor of the '639 patent (after the application for the '639 patent had been filed). There is no doubt from the record that Cronin and Raytheon obtained their first knowledge of the cathodes in suit from Philips, and they obtained no help whatever from the prior art. Spectra-Mat's prior art defenses are based entirely upon hindsight. Dr. Rittner testified that the prior art can lead the prospective inventor very badly astray. [Cronin Tr. 1114–5, 1118–9, 1170–96; Rittner Tr. 306, 358–60, 408; PX–42]

21. After Cronin's team finally succeeded in preparing a satisfactory barium-aluminate impregnated cathode, he submitted two "invention" disclosures to Raytheon's patent department—one in the names of Cronin and Dyer directed to the method of impregnating the cathode, and one in Cronin's name alone directed to the unique barium aluminate impregnated cathode. They were characterized as an "important contribution" to the Raytheon cathode development program. Raytheon's patent department

decided that patent applications should be filed on these inventions, but while they were being prepared the '118 and '000 patents in suit issued disclosing the same inventions. Raytheon's patent department thereupon decided not to file these patent applications, but Cronin and Dyer received a bonus for their "important contribution". [Cronin Tr. 1197–1211; PX–40, –41]

### C. The Patents in Suit

22. At Philips Laboratories, an extensive research program began in the late 1940's to improve on the European "L" cathode. This effort involved a team of scientists and technicians which met regularly to discuss progress that had been made, and where future investigations should be concentrated. The cathode inventions covered by the three patents in suit were made in the course of this program. [Rittner Tr. 118–23, 125–7, 138–43, 146–7, 326–32]

### 1. The '118 "Reaction" Patent

23. Philips' scientists Ray C. Hughes, Patrick P. Coppola and Edmund S. Rittner, during the lengthy research program, discovered in March 1951 that when tungsten is intimately mixed in the form of powder with powdered barium carbonate (the traditional elemental ingredients of the "L" cathode) and then formed into a dispenser cathode by shaping, pressing and sintering, the cathode was a complete failure since it would not emit any electrons. Continuing their research, they discovered that an undesirable reaction unexpectedly occurred in the intimate mixture which prevented the release of the desired free barium. Having ferreted out the problem, they carried out further experiments and eventually discovered a solution for it. They determined that the undesirable reaction, which tied up the barium, could be avoided by reacting the barium carbonate with aluminum oxide to produce certain barium aluminates. In this condition, when the cathode is in actual operation, the barium aluminate thermally reacts with the refractory tungsten metal to produce free barium, which then migrates to the surface of the cathode, lowers the work function of the tungsten and achieves superior electron emission. [Rittner Tr. 138–42, 296, 298–302; PX–5]

24. The invention of Hughes, Coppola and Rittner was an entirely new dispenser cathode comprising in its preferred form an intimate mixture throughout of a major portion of tungsten and a minor portion of certain barium aluminate compositions. The tungsten particles were sintered together to form a porous matrix containing within the pores a supply of barium aluminate compositions which reacted continuously with the tungsten during cathode operation to provide free barium. The latter migrated to the surface of the porous tungsten matrix where it formed a monomolecular layer which greatly enhanced the emission of electrons from the tungsten. [Kelley Tr. 678–92; Rittner Tr. 138–42; PX–1A, –5, –8]

25. Cathodes made by means of this "reaction" invention have many advantages over the pre-1950 cathodes. Unlike the "L" cathodes, they do not require complicated welding to seal off a cavity containing activating material, since the activating material is already sealed within the tiny pores of the tungsten matrix. This shortens the activation time, improves heat transfer to the emitting surface, and permits reactivation after exposure to air. These cathodes also have numerous advantages over oxide-coated cathodes including much higher D.C. emission, resistance to sparking and ion bombardment, and ease of activation. [Rittner Tr. 200–2; Cronin Tr. 1107, 1108–9; PX–1F, –1H, –1J]

26. The '118 patent discloses and claims the basic reaction invention, and the patent specification refers in column one to the only commercially significant prior art dispenser cathode (the "L" type disclosed in Lemmens patent 2,-543,728). It describes the desirable objectives achieved by the reaction invention, such as controlled evaporation of emissive material, avoidance of unde-

sirable reactions, and much more efficient utilization of the activating material. The newly discovered undesirable reaction between tungsten and barium carbonate which prevents the production of free barium ($3BaCO_3 + W \ggg \rightarrow Ba_3WO_6 + 3CO$) is set forth. In column 2 (lines 55–62) the inventors explain how this undesirable reaction can be avoided by the use of a fused mixture of certain proportions of barium oxide and aluminum oxide. The six claims are all drawn to the unique thermionic dispenser cathode made possible by employing intimate mixtures of the described ingredients. The preferred embodiment of the invention is the tubular style pressed cathode represented by Figure 4 of the patent drawings wherein tungsten powder and aluminate powder are pre-mixed, and then shaped and sintered. [Kelley Tr. 540–6, 550–3, 555–8; PX–1A]

27. The description, examples and drawings of the '118 patent fully comply with the patent statutes by explaining to those skilled in the dispenser cathode art how to practice the invention. The '118 patent discloses that compositions of an alkaline earth metal oxide and aluminum oxide should contain 60–90% by weight of the alkaline earth metal oxide and the preferred alkaline earth metal oxide is barium oxide. This is further illustrated by a specific example. In lines 21 through 58 of column 4 instructions are given for making a pressed cathode by intimately mixing about 90% of powdered tungsten and 10% of a 70–30 barium aluminate composition, then shaping the mass under pressure, and sintering it at 1370°C. for 20 minutes. Detailed operating characteristics of these cathodes are supplied. [Kelley Tr. 540–6; PX–1A]

28. The file wrapper of the '118 patent shows that the Patent Examiner considered prior art which is in all pertinent respects fully equivalent to or better than the "best art" advanced by defendants in this action. The latter adds nothing to the art cited during prosecution. The Examiner properly concluded that the patent claims were distinguishable from and patentable over all such prior art, thereby adding to the statutory presumption of validity arising from the grant of the patent. There are important differences between the prior art and the claims at issue, some of which are itemized below with specific reference to particular prior art citations. [Kelley Tr. 776, 781–4; PX–5, –11, –35]

29. Spectra-Mat listed dozens of prior art patents and publications, but before trial singled out Lederer patent 2,185,410, Hull patent 2,246,176 and German patent 529,392 as the closest to the '118 patent. The German patent was apparently relegated to a position of less importance, because Spectra-Mat offered no evidence in connection with in. The Lederer and Hull patents were the subject of considerable expert testimony, and their teachings are no closer to the '118 patent than the prior art considered by the Patent Examiner. [Kelley Tr. 642; PX–35; DX–6, –7, –17]

30. The shortcomings of Lederer include among other things the fact that it is not a dispenser cathode but merely a variation of the old thoriated tungsten filament. Lederer also describes another version which is an oxide-coated cathode whereby "emission may be increased". There is no porous sintered refractory metal body as claimed in the '118 patent, but rather a metal body comprising an alloy of nickel and tungsten which is mechanically worked to eliminate any pores. Lederer's barium-berylliate is thus not contained in pores, and furthermore it is rich in BeO, rather than BaO as claimed, and it is thus not "thermally reactive" with the nickel-tungsten alloy to produce free barium metal at the cathode's operating temperature. As further explained by Dr. Rittner, nickel is not a refractory metal and cannot be used in a cathode operated at 1,000°C., and nickel is a known poisoning agent in tungsten dispenser cathodes. [Rittner Tr. 296, 298–302, 304; Kelley Tr. 785–97, 815–9, 821–30; PX–35; DX–6]

31. The shortcomings of Hull include among other things no "porous sintered"

body as claimed in the '118 patent but rather a woven wire mesh enclosing a mass of barium aluminate. Hull's complicated structure was described as a "monstrosity", and it saw only limited commercial use in gas tubes, and has long been obsolete. There is unchallenged evidence, moreover, that while Hull described the dispenser principal the cathodes that were made actually operated as oxide emitters with emission coming from a bulk layer of barium oxide on the vanes. [Rittner Tr. 165–9, 201; Nowogrodzki Tr. 521–2; 525; Kelley Tr. 830–44; PX–35; DX–7, –19]

32. The file wrapper also shows that the inventors limited their patent claims to cover only their major contribution to the art, the intimately mixed, pressed and sintered cathode. The application claims as originally filed were broadly directed to both intimately mixed and cavity cathodes. But the claims which were eventually allowed in the '118 patent were limited to the intimately mixed type, however made. These claims cover both the pressed cathode of Fig. 4 and the impregnated cathode of the '000 patent in suit. The claims of the '118 patent do not cover the embodiments shown in Figs. 1–3 thereof. [Kelley Tr. 547–65, 699–707; PX–8]

33. The Spectra-Mat cathodes designated SM29–50280, SM29–53280, SM29–41180 and SM29–31180 have each and every element specified in claim 2 of the '118 patent, as well as the broader claims 1, 3 and 4 which are also charged to be infringed. They have the same structure and operate in the same manner as the claimed cathodes. [Kelley Tr. 565–6, 809–15, 852–4; PX–1Z, p. 1]

## 2. The '000 "Impregnating" Patent

34. After the reaction invention was completed, Philips' scientists Ray C. Hughes and Roberto Levi in September and October, 1951, made an important improvement on it. They discovered that, if the porous tungsten matrix is first made separately and then impregnated with molten compositions of the '118 patent to attain intimate mixture with the tungsten emitter, the high temperatures connected with such a melting operation surprisingly do not cause a reaction which negates effective utilization of the barium. [Rittner Tr. 206–7, 222–3; PX–6]

35. Levi and Hughes had discussed the concept of heating the barium aluminate above the sintering temperature then considered maximum for the pressed cathodes until it was actually molten, and impregnating a tungsten matrix from the liquid melt, but Dr. Rittner dismissed the concept and warned that the high temperatures necessary to liquefy the aluminate would speed up the chemical reactions to the point where all the available barium would be lost before the cathode was even completed. To everyone's surprise, however, not only was the barium retained in an available form contrary to all predictions, but the emission results were extremely good. [Rittner Tr. 222–3; PX–6]

36. Hughes and Levi thus invented the extremely important dispenser cathode made from a previously sintered and shaped tungsten matrix only the tiny surface-connected pores of which are impregnated from a melt formed by fusing barium oxide and aluminum oxide in certain proportions for intimate mixture with the tungsten. This cathode permits precise machining of the tungsten prior to impregnation. It provides during operation a continuous chemical reaction which evolves free barium which migrates to the surface of the porous tungsten matrix to form the desired extremely thin layer necessary to produce electron emission from the tungsten. [Rittner Tr. 203–4; Kelley Tr. 571–7; PX–1B, –6, –9]

37. The "impregnating" invention of the '000 patent has many advantages over the '118 "reaction" invention. For instance, in the pressed type dispenser cathode the sintering, which controls the strength and density of the tungsten matrix, cannot be conducted at a temperature significantly above the melting temperature of the barium-aluminate activator nor for a prolonged period

without causing excessive evaporation. But by use of the "impregnating" invention where the matrix is previously sintered remote both in time and space from the aluminate, any desired sintering temperature and time may be utilized to accurately control the matrix strength, the pore size, and the number of pores. Similarly, the subsequent impregnation operation is carried out under optimum conditions, and the interior pores of the matrix which do not connect with the surface will receive no molten aluminate so all the aluminate present in the interior of the matrix is useful. The most important advantage, however, is the ability to machine the matrix with conventional tools to extremely close tolerances (i. e., .001 of an inch) of the most intricate shapes and sizes imaginable, and the emitting surface may be machined to optimum smoothness. [Rittner Tr. 214, 239-40; Nowogrodzki Tr. 482-3; Kelley Tr. 571-2, 578-9; PX-1G, -1Y]

38. The '000 patent makes reference (column 1, line 22) to the prior cavity ("L" type) dispenser cathodes, and (column 2, line 64) to the application for the '118 patent covering the basic reaction invention. The patent contains seven claims to the impregnated cathode product, and seven claims to methods of manufacturing it. The '118 and '000 patents teach a cathode having porous sintered tungsten intimately mixed with a barium oxide-aluminum oxide composition containing 60 to 90% by weight barium oxide or a mol. ratio of barium oxide to aluminum oxide in the range of from 1:1 to about 6:1. Beginning at line 41 of column 3 and extending through line 24 of column 4 of the '000 patent there is a detailed discussion of the preferred embodiment of the invention. Reference is made to another patent specification for a detailed disclosure of advantageous ways to prepare the tungsten matrix, a specific 5:2 mol. ratio of barium carbonate and aluminum oxide which fuse into barium-aluminate is recommended, impregnation of the porous tungsten matrix with the fused aluminate at about 1700°C. is described, and many operating characteristics of cathodes made in this fashion are provided. [Kelley Tr. 585-7; PX-1B]

39. There are significant differences between the prior art and the claims at issue, and the Patent Examiner considered prior art showing dispersal of molten ingredients into porous substrates which is at least as close as the art advanced by Spectra-Mat at the trial. Spectra-Mat at trial concentrated its efforts on Lemmers patent 2,121,637, Lafferty patent 2,499,192, Espe patent 2,121,589 and the '118 patent. The '118 patent is not available as prior art because the '118 patent does not describe the impregnating invention, and the application for the '118 patent was filed (Nov. 29, 1951) after Levi and Hughes made the impregnating invention in September and October, 1951. The fact that Hughes, as a co-inventor in the spring of 1951 of the earlier reaction invention obviously knew of that invention before he and Levi made the impregnating invention does not make the '118 patent prior art against the '000 patent. The '118 disclosure cannot properly be used alone, or combined with other art showing impregnation of a porous structure, in an effort to show that the impregnating invention was obvious at the time it was made. The Examiner who granted the '000 patent was aware of the earlier application for the '118 patent, but he recognized that it was not available as prior art so he never used it alone or in combination with other art to reject the claims for the impregnating invention. He cited Hertz patent 1,735,080 disclosing barium azoimide applied in a "fused" or liquid state "within the pores" of an electrode and Kurtz patent 2,389,060 disclosing impregnation with a thorium nitrate solution, but these are both oxide emitters using the wrong ingredients, and he never attempted to combine these disclosures with the ingredients disclosed in the '118 application to reject claims for the impregnating invention. [Kelley Tr. 641,

**344**

877–88; PX–8, –9, –11L, –11P, –11Z, –35; DX–5]

40. In any event, the impregnating improvement invention is patentable over and above the broader reaction invention, even if the latter could somehow be considered "prior art" against it. If the inventions were one and the same thing, the Examiner would certainly have rejected the claims for the impregnating invention over the copending reaction application on grounds of double patenting, but he never did this. He undoubtedly realized that the impregnating invention was a separate, narrower invention arrived at by independent investigations of Levi and Hughes some time after the basic reaction invention had been made by Hughes and others. Even with complete knowledge of the reaction invention in the summer of 1951 by one having ordinary skill in the cathode art, the impregnating invention still would not have been obvious. The fruitless efforts by Cronin and his team of Raytheon scientists is conclusive proof of this. [Rittner Tr. 222–3; Cronin Tr. 1107–15, 1137–44; PX–37–40]

41. The shortcomings of Lemmers include among other things the fact that it is one of the old oxide type emitters, the emission being from barium hydroxide. There is no impregnation with a fused mixture of the claimed ingredients in the claimed proportions to form a metal dispenser cathode as claimed in the '000 patent. [Kelley Tr. 887–8; Rittner Tr. 142, 306, 309–10; PX–35; DX–5]

42. The shortcomings of Lafferty include among other things the fact that there is no sintered body of refractory metal provided with a large number of interconnected pores as claimed, but rather a molybdenum coil forming a cavity for a mass of an unspecified type of barium aluminate. There is no impregnation of interior pores with a fused mixture. Lafferty requires protruding aluminate between the coil turns to prevent short circuits, which causes excessive barium evaporation. The only commercial use of this cathode was in a specialized "atom smasher", and it is now obsolete. [Kelley Tr. 707–12, 734–5, 846–7; Nowogrodzki Tr. 502; Rittner Tr. 177–8, 309; PX–11L, –35]

43. The Spectra-Mat cathodes SM29–50280, SM29–53280, SM29–41180 and SM29–31180 and the methods by which they are made have each and every element and step specified in representative product and method claims 9 and 14 of the '000 patent, as well as the broader claims 1–7 and 10–13, inclusive, which are also charged with being infringed. All these cathodes are made by impregnating from a melt, which is the "heart" of the '000 patent. [Kelley Tr. 584, 604–8; PX–1Z, pp. 2–3]

### 3. The '639 "Additive" Patent

44. In 1954, Dr. Roberto Levi made an important discovery which was a major step forward in the Philips cathode development program. After the invention of the '000 impregnated dispenser cathode, it became apparent that its electron emission level was not as high as theoretical calculations by Dr. Rittner indicated it should be. Additional investigations revealed only that a mysterious internal poisoning effect was somehow inhibiting full emission, providing no useful clue to where the search for a corrective solution should begin. [Rittner Tr. 214–6, 223–4; Levi Tr. 1367–70; PX–7]

45. The existing knowledge ruled out alkaline earth metal oxides as potential anti-poisoning materials. One member of that class of chemicals—the barium oxide—was already present in the aluminate. It did not correct the poisoning effect, but apparently contributed to it. It was also known that the best activator for tungsten was barium, and strontium and calcium were known to increase the work function of monolayer activated tungsten and thus reduce the desired emission. These factors deterred away from the alkaline earth metal oxides. After fabricating numerous unsuccessful experimental cathodes with oxide materials other than the alkaline earth metal oxides, none of which showed promise,

Dr. Levi discovered that a cathode made with barium-aluminate plus magnesium oxide—for certain purposes sometimes grouped with the alkaline earth metal oxides proper such as barium, calcium and strontium oxides—gave a significant increase in emission. This research ultimately led him to fabricate a cathode to which calcium oxide was added, and the results were astonishing. Lengthy additional research showed that strontium oxide as well as magnesium and calcium oxides corrected the poisoning and permitted high level emission when added to barium aluminate or barium borate. But the unique contribution of these three oxides—which for some unknown reason is not exhibited by their "close relative" barium oxide—is not fully understood to this day. There is no question that even a small amount of the additive performs a unique function overcoming the poisoning agent to permit high level emission. [Rittner Tr. 214–6, 224–5, 227–8; Kelley Tr. 614–18, 673–4; PX–7]

46. In 1954, Dr. Levi thus invented the improved "additive" type of dispenser cathode, a basic invention of real significance. This comprises a densely sintered and shaped tungsten matrix intimately mixed with a fused mixture of emission enhancing material wherein it is mandatory to have barium oxide, and more than one mole of it for each mole of aluminum oxide, with the addition of an anti-poisoning ingredient such as calcium oxide. The latter is present in an amount which increases the emission of the cathode at least twice that of a similarly constituted cathode without the anti-poisoning addition. [Kelley Tr. 888–901; Rittner Tr. 210; PX–1C, –7, –10]

47. The additive invention increases the emission capabilities of the final cathode by a factor of nearly five at the same operating temperature. The same emission level of the '000 impregnating invention may thus be achieved with significantly lower operating temperatures, which reduces heater failures, reduces undesirable emission from other elements in the tube which are not supposed to emit, and minimizes the rate of barium evaporation and thus prolongs cathode life. When the aluminate including the additive is melted into the tungsten matrix in a hydrogen atmosphere—as also taught and claimed in the '639 patent—the time for activating the cathode when it is eventually sealed in a tube is reduced by tremendous amounts, from 3 days to 2–3 hours. [Levi Tr. 1388–9; Rittner Tr. 217–8; Kelley Tr. 618–26; Cronin Tr. 1120, 1123; PX–42, –43; DX–32]

48. More astonishing with the '639 invention the rate of barium evaporation decreases as the electron emission increases, an apparently contradictory combination of benefits which is completely unpredictable and multiplies the life of the cathode many fold. Dr. Levi explained that the 5-fold increase in emission permits lowering the operating temperature to the point where the total reduction in barium evaporation for the same emission density is an astounding "factor of forty". The average life for the '000 patent type "A" cathodes at 2 amperes per square centimeter is 5,000 hours, but the "life of a Type B cathode at two and a half amperes per square centimeter is 70,000 hours. That's an improvement of a factor of 14. It's almost ten years." [Levi Tr. 1388; Rittner Tr. 241, 366–7; PX–1F, –42, –43; DX–32]

49. Mr. Nowogrodzki explained that the Philips type "B" additive cathode was superior to the type "A" cathode in many respects so that "there is absolutely no advantage" in using the latter for most purposes if the type "B" is available. [Nowogrodzki Tr. 461–2]

50. The '639 patent commences with the discussion of the advantages obtained by use of the calcium oxide emission-increasing additive. In column 4 there is a table of data illustrating the advantages of the addition of calcium oxide to cathodes containing what was previously the standard 5:2 combination of barium oxide and aluminum oxide. Beginning at line 9 of column 3 and extending through line 17 of column 4 of

the '639 patent disclosure there is a detailed discussion of the preferred embodiment of the invention. This typifies the commercial procedure presently used by Dr. Levi in producing the Philips "B" cathode at Philips Metalonics as well as the commercial procedures used by Spectra-Mat in producing the accused SM29–53280 cathode. [Kelley Tr. 608–14, 618–26; PX–1C, –1E, –21; Pre-Trial Order, Section (6), paras. 14–24]

51. During prosecution of the application for the '639 patent, it was explained that the critical excess of barium oxide in combination with the additive was responsible for the unexpected benefits in the pending application claims. Pursuant to the Patent Examiner's recommendations, the patent solicitor submitted an affidavit signed by Dr. Levi in June, 1958, to provide further evidence that the "excess of 1:1" mole ratio limitation was indeed critical to obtain enhanced emission. The affidavit contains a table of the relative emission capabilities of cathodes prepared and evaluated by Dr. Levi. Items 15, 17, 18, 19 and 20 are cathodes wherein strontium and/or calcium have been substituted in whole or in part for the barium in a manner which reduces the barium content so that there is one or less moles of barium carbonate for each mole of aluminum oxide. In each of these cathodes, the emission was negligible compared with a 5:2 type "A", and the cathodes consequently gave poor emission. In the remaining items in the table—with the exception of the "reference" 5:2 type "A" cathode of item 1—the additive was present in a mixture which included more than one mole of barium carbonate for each mole of aluminum oxide, and the relative emission at zero field was substantially enhanced. These data caused Dr. Levi to correctly conclude that the substitution of calcium or strontium, in whole or in part, for the barium as disclosed in column 3 of the '000 patent does not enhance the emission of the cathode; whereas, the addition of either calcium or strontium to a mixture of barium oxide and aluminum oxide containing more than one mole of barium oxide for each mole of aluminum oxide does enhance the emission of the cathode. The affidavit was helpful to the Examiner and it clearly informed him of the criticality of having an excess of barium oxide. [Levi Tr. 1353–7; Kelley Tr. 927–31; PX–1B, –10, –11]

52. Undoubtedly the closest prior art to the '639 patent is the '000 patent, and there is no question that it was considered in detail and then discarded prior to the decision by the Patent Office to grant the '639 patent. The only reference to calcium oxide in the '000 patent is the isolated statement at column 3, lines 66–69: "Compositions containing barium as the alkaline earth metal are preferred but strontium and/or calcium may be substituted for the barium in whole or in part." This teaches that the results will be poorer if barium oxide is replaced. There is no hint whatsoever of the advantages of adding calcium oxide later discovered by Dr. Levi. [Kelley Tr. 598–9, 601–2, 888–901; PX–1B, –10]

53. Each and every claim of the '639 patent in suit contains two or more of the following requirements, none of which are present in the '000 patent. Each of these claims thus distinguishes from the '000 patent in at least two of the following specific steps or elements:

Singling out barium oxide as opposed to other alkaline earth metals as the indispensible ingredient;

Mandatory requirement that the barium oxide be present in a mole ratio exceeding 1:1;

Presence of calcium, strontium and/or magnesium oxide known to enhance emission;

Amount of emission enhancing additive being sufficient to at least double the emission density of the cathode;

Limited range specified for emission enhancing calcium oxide additive;

Specific ratio of the emission enhancing calcium oxide to the specific 5:2 barium aluminate;

Hydrogen or reducing atmosphere used during impregnation with additive activator. [Rittner Tr. 217, 223–4; Levi Tr. 1356; PX–1B, –1C]

54. Spectra-Mat has also relied on British patent 411,266 and a publication referred to as the "Grey *Nature* article" as teachings of the '639 additive invention. Both of these relate to the old oxide type emitters where the presence of strontium or calcium oxide has long been known to improve emission from the oxide, and that calcium oxide alone produces negligible emission. But there is no aluminum oxide present in these references, no sintered tungsten, and no suggestion that calcium oxide will cure an internal poisoning agent in metal cathodes operating on the dispenser principal, all as claimed in the '639 patent. The numerous advantages which arise from the use of calcium oxide as an additive in dispenser cathodes are not suggested in these or any other references. They do not weaken the presumption of validity. The presumption is strengthened by the Patent Office's consideration of the '000 prior art patent. [Rittner Tr. 256; Kelley Tr. 941–6, 952–5; PX–35]

55. The following cathode compositions when intimately mixed with porous tungsten are included within some of the claims of the '639 patent:

| Composition Ingredients in Mole Ratios | | |
|---|---|---|
| BaO | CaO | Al₂O₃ |
| 4.5 | .5 | 2 |
| 4 | 1 | 2 |
| 3.5 | 1.5 | 2 |
| 3 | 2 | 2 |
| 2.5 | 2.5 | 2 |

56. Spectra-Mat cathodes SM29–53280, SM29–41180 and SM29–31180 and the methods by which they are made have each and every element and step specified *in representative product and method* claims 7 and 14 of the '639 patent, as well as the broader claims 1, 2, 5, 6, 8–13 and 15–17, inclusive, which are also charged with being infringed. Since the SM29–50280 cathodes does not contain calcium, strontium or magnesium oxide

it does not infringe the '639 patent. [Kelley Tr. 626–37; PX–1Z, pp. 4, 5]

57. Spectra-Mat's non-infringement theory that a thin, invisible layer of aluminate is left smeared on the surface of its cathodes to provide a source of emission is contrary to established knowledge concerning such dispenser cathodes. It is contradicted by Spectra-Mat's own cleaning and polishing operation designed to remove the excess aluminate. It is completely disproved by Dr. Levi's unchallenged test which records identical emission data from an untreated cathode as sold by Spectra-Mat and from an identical Spectra-Mat cathode treated by Dr. Levi with nitric acid to dissolve and remove any alleged aluminate that may have been left on the tungsten emitting surface. [Rittner Tr. 234, 368–71; Levi Tr. 1385–8; Kelley Tr. 565–6, 760–4; PX–32, –45]

## D. *The Patented Philips Cathodes*

58. The inventions covered by the three patents in suit, and brought to fruition in the "B" cathode manufactured and sold by Philips Metalonics, are the result of a several year research program involving many skilled technicians and scientists and costing tremendous sums. Dr. Rittner explained that "since the original invention of the oxide cathode and the thoriated tungsten cathode, roughly thirty years at least went by until these Philips inventions, and there were no significant commercial cathodes produced until the Philips inventions, and subsequent to that time, almost twenty years have gone by, and there have been no further significant inventions of this character." [Rittner Tr. 118–21, 266]

59. In a relatively short time after the Philips cathode became available commercially, it caused a tremendous impact on the entire electronics industry. It solved the long felt need for a better cathode, and opened up new areas of electron tube design. [Rittner Tr. 243–5; Nowogrodzki Tr. 457, 467; PX–1N]

60. As soon as the basic patent applications had been filed, the Philips inventors freely published technical papers describing the results that had been obtained and the extensive research and development that had been necessary to explain the principles underlying the mechanism of operation of this new class of cathodes. These papers stimulated their scientific colleagues throughout the world to perform further research and development, and make further improvements that would advance the frontiers of science. These papers were accepted and published by scientific journals of the highest repute and read at scientific meetings acknowledging the general acceptance by the scientific community of the advance fathered by the Philips inventors, and of their technical explanations for their results. [Rittner Tr. 67; PX–26, –27, –28, –36, –42, –43; DX–32]

61. Despite the large expense involved in redesigning new tubes to take advantage of the improved cathodes, the major tube companies immediately undertook large scale development programs to test the usefulness of these cathodes, especially in the microwave tube area. Their progress within several years established a commercial market of significance for these cathodes, and they soon became the cathode of choice by many designers of high power, high frequency tubes. [Nowogrodzki Tr. 438, 459, 466–7, 484–5, 515; Rittner Tr. 240, 243, 246; PX–1H, –1J]

62. The improved microwave tube designs, which used the Philips cathodes, made available improved electronic equipment and systems which themselves represented important breakthroughs in the art. These new systems and equipment were vitalized by the advanced tubes made possible by these improved dispenser cathodes. [Rittner Tr. 243–4; Nowogrodzki Tr. 449, 451, 456; PX–1N]

63. A whole new generation of sophisticated electronic testing equipment, such as sweep oscillators and signal generators, use the Philips cathode. Much of the commercial sales by the defendant Watkins-Johnson of backward wave oscillator (B.W.O.) tubes contained these dispenser cathodes, many of which are manufactured by the defendant Spectra-Mat, and are sold to manufacturers of such instruments. [Nowogrodzki Tr. 482; PX–1Q, –1R]

64. New tubes which use these cathodes include magnetrons operating at a fantastic 95.5 thousand million cycles per second with a cathode capable of current densities up to 400 amperes per square centimeter. Another is magnetrons with pulse widths three times that possible with previously available cathodes, and with a 3–5 fold increase in life with processing time reduced by a factor 3. Starting times within a thousandth of a millionth of a second were made possible by the "very finely machined rings" on the cathode of a magnetron for airborne weather radar tubes. Traveling wave type tubes with extremely low electrical noise became possible using the high emission density of the Philips cathodes. [Nowogrodzki Tr. 455–7, 460, 465–7, 483–5; PX–1J, –1K, –23, –24]

65. An example of the extraordinary tubes using these new cathodes is the giant klystron tubes, which are the heart of the super-power radar systems constituting the "DEW Line" defensive network which guards our northern border. These giant klystron tubes contain a 5 inch dish-shaped dispenser cathode. [Rittner Tr. 240; Nowogrodzki Tr. 449; PX–1S]

66. The "Telstar" and the "Comsat" communications satellite systems which beam television signals between distant cities and continents contain traveling wave tube amplifiers using Philips cathodes in the ground stations which receive the television signals transmitted from the satellites in outer space. [Rittner Tr. 240–6; PX–1P, –1T]

*E. The Defendants' Accused Cathodes*

67. A detailed statement concerning the accused Spectra-Mat cathodes and the manner in which they are made appears in the admitted facts section of the Pre-

Trial Order. Mr. Cronin testified that this statement is accurate, and as such there is no question that the Spectra-Mat cathodes and the methods by which they are made clearly infringe the claims in suit as noted above, and benefit from the teachings of the Philips patents. [Cronin Tr. 1240–54; Kelley Tr. 605–7, 674–8; PX–1E, –21; DX–172; Pre-Trial Order, Section (6), paras. 14–24]

68. Spectra-Mat cathodes designated SM29–53280 or SM29–31180 have been and still are being sold by Spectra-Mat to Watkins-Johnson under Watkins-Johnson drawing numbers 302063 and 301802. Vacuum tubes which Watkins-Johnson manufactures and sells are identified by the designations SE 209, SE 216, WJ 2001, WJ 2003, WJ 2004, WJ 2006, WJ 2007, WJ 2008, WJ 2020, WJ 2005, WJ 2018 and WJ 2019, and these tubes include Spectra-Mat cathodes purchased by Watkins-Johnson under these drawing numbers. [Pre-Trial Order, Section (6), paras. 29, 34, 35; PX–1Q]

69. Three of Watkins-Johnson's principal commercial customers for the foregoing vacuum tubes are Hewlett-Packard and Alfred Electronics both of Palo Alto, California, and Micropower, Inc. of New York, and these companies are engaged in the business of manufacturing and selling electronic equipment which utilizes as an essential component one or more of the Watkins-Johnson vacuum tubes. Some of this electronic equipment is sold by these companies for civilian as opposed to government end use, and most of the purchase orders received by Watkins-Johnson from these customers contain no indication whatsoever that the vacuum tubes are to be used in electronic equipment which is to be sold to the U. S. Government or is otherwise destined for government end use. [Pre-Trial Order Section (6), paras. 36, 37, 38; PX–1R]

70. It is no accident that the Spectra-Mat cathodes are interchangeable with the Philips cathodes. Cronin did research and development work on cathodes of the tungsten impregnated type for his employer Raytheon until 1957, as dis-

cussed previously, at which time he joined Semicon of California. Semicon of California was a California operation of Semicon Associates, a company that had been founded by Otto G. Koppius, a former Philips employee who had participated in the cathode development program of the early 1950's at Philips. Through Koppius, Cronin obtained complete information on the various manufacturing techniques that had been created in the early 1950's at Philips after extensive research and development. [Pre-Trial Order, Section (6), paras. 7, 8, 9; PX–33]

71. In the spring of 1963, Semicon Associates, including its division Semicon of California, were acquired by and merged into Varian Associates, Inc., a California-based electron tube company. Varian moved the equipment and personnel from Semicon of California into its own California facility and closed down the former operation where Cronin had been employed. Cronin did not go to work for Varian, but instead founded Spectra-Mat to manufacture and sell "Philips" cathodes to the electron tube industry. When Cronin set up Spectra-Mat in mid-1963, he had full knowledge of the two patents in suit which had issued at that time. [Pre-Trial Order, Section (6), paras. 10, 11; PX–33]

### F. The Fraud Defense

72. Spectra-Mat has contended that the patentees of the '118 patent failed to call Hull patent 2,246,176 to the attention of the Patent Office, but this is immaterial because the record shows as discussed above that Hull provides no useful teaching, and the Patent Office considered the most relevant prior art including Francis patent 2,071,973 which in all pertinent respects is as good as or better than Hull. [Kelley Tr. 642, 830–44; PX–8, –11V, –35]

73. Spectra-Mat has also contended that Philips was less than candid with the Patent Office in soliciting the '639 patent by (1) stating to the Patent Office that the substitution of calcium or

strontium, in whole or in part, for the barium as disclosed in the '000 patent does not enhance the emission of the cathode and (2) stating to the Patent Office that the subject matter of the '639 patent was disclosed in the '000 patent. The record is undisputed that Dr. Levi made the calcium oxide additive invention in 1954—more than two years after the application for the '000 patent was written and filed in February, 1952. The record also shows that the information supplied by Dr. Levi in his affidavits is true and accurate, it completely supports the conclusions which are drawn, and the conclusions fairly and accurately state the performance of these cathodes in accordance with all knowledge and information known to Philips and Dr. Levi from his tests and otherwise at that time, and indeed to the present day. [Rittner Tr. 225; Levi Tr. 1383; Counsel admission, Tr. 1488; PX–1B, –7, –10]

74. It is clear from the record that the patentees of the three patents in suit fully and fairly presented to the Patent Office all essential facts concerning the prior art, the emission values, the critical ingredients and ratios of ingredients, and all other matters relating to the subject matter of the patents. The Patent Office was aware of all pertinent facts relating to the above before the claims were allowed, and Spectra-Mat has failed to carry its burden of proving fraud or lack of candor. [Levi Tr. 1383; Counsel Admission, Tr. 1505]

### G. The Misuse Defense

75. Spectra-Mat has also charged that in licensing its dispenser cathode patents Philips has misused them in one or more respects. The three patents in suit are "blocking" patents in the sense that that expression is used in the Landon case (336 F.2d 723, 9th Cir. 1964) since the popular commercial cathodes such as the Philips Metalonics Type "B" and its Spectra-Mat counterpart SM29–53280 made under the '639 additive patent necessarily infringe the broader '000 patent because they are made by impregnation from a melt, and they also infringe

the basic, generic '118 patent because they have the intimate mixture of tungsten and aluminate activator throughout. The Philips type "A" and Spectra-Mat SM29–50280 infringe the '118 and '000 patents but do not infringe the '639 patent, and it is possible to infringe the '118 patent without infringing the '000 and '639 patents, although these facts do not negate the blocking nature of the three patents. [Rittner Tr. 210, 241; Kelley Tr. 581–4; Pelton Tr. 1293]

76. There is no evidence that anyone prior to the present litigation had ever requested a license under less than all the Philips dispenser cathode patents, with the one exception of the "copper machining" patent 2,669,008, a non-blocking patent not in suit which Philips licensed individually upon request. Spectra-Mat has failed to carry its burden of proving a licensing policy which would be a misuse of the patents in suit. [Pelton Tr. 1282, 1290–9, 1302–5, 1306–7]

77. The manner in which Philips has licensed its dispenser cathode patents is designed to make the tungsten impregnated dispenser cathode generally available to the electron tube industry. There is nothing in the record to support Spectra-Mat's contention that it is a patent misuse to base a royalty for a license under the patents in suit on the value of the electron tube incorporating the patented cathodes. Since July 1, 1964, Philips has offered to license its group of approximately 20 dispenser cathode patents for a royalty of 15% of the net selling price of the licensed cathode. After commencement of this action, Spectra-Mat sought a license under the three patents in suit without any license under the remaining patents in the group. Philips was willing to grant such a license but at the same 15% royalty for these three patents. 15% is lower on the average than the royalty previously paid by many large electronics companies on the net sales value of the electron tubes containing such cathodes. [Pelton Tr. 1280, 1287, 1303, 1306, 1308, 1311–14; Cronin Tr. 1094–6, 1226; PX–43]

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties and the subject matter of the action.

2. Plaintiff, U. S. Philips Corporation, is the sole owner of the three patents in suit, with the right to recover for infringement thereof.

3. United States Patents No. 2,700,118, No. 2,700,000 and No. 3,201,-639 describe and claim inventions which satisfy all the requirements of 35 U.S.C. §§ 101–103 of utility, novelty and non-obviousness, and said patents are good and valid in law and are enforceable against infringers thereof.

4. Claims 1, 2, 3 and 4 of U. S. Patent No. 2,700,118 are infringed by the dispenser cathodes manufactured and sold by defendant Spectra-Mat under the designations SM29–50280, SM29–53280, SM29–41180 and SM29–31180; and said claims are infringed by the use of such dispenser cathodes in electron tubes manufactured or sold by the remaining defendants which contain any of said cathodes.

5. Claims 1, 2, 5, 6, 7 and 9 of U. S. Patent No. 2,700,000 are infringed by the dispenser cathodes manufactured and sold by defendant Spectra-Mat under the designations SM29–50280, SM29–53280, SM29–41180 and SM29–31180; and said claims are infringed by the use of such dispenser cathodes in electron tubes manufactured or sold by the remaining defendants which contain any of said cathodes.

6. Claims 3, 4, 10, 11, 12, 13 and 14 of U. S. Patent No. 2,700,000 are infringed by defendant Spectra-Mat's methods for the manufacture of its aforesaid cathodes.

7. Claims 1, 2, 5, 6, 7, 12, 16 and 17 of U. S. Patent No. 3,201,639 are infringed by the dispenser cathodes manufactured and sold by defendant Spectra-Mat under the designations SM29–53280, SM29–41180 and SM29–31180; and said claims are infringed by the use of such dispenser cathodes in electron tubes man-ufactured or sold by the remaining defendants which contain any of said cathodes.

8. Claims 8, 9, 10, 11, 12, 13 and 14 of U. S. Patent No. 3,201,639 are infringed by defendant Spectra-Mat's methods for the manufacture of its aforesaid cathodes.

9. Cathodes manufactured by defendant Spectra-Mat under designation SM29–50280 do not contain calcium, strontium or magnesium oxide and thus they do not infringe U. S. Patent No. 3,201,639.

10. A Writ of Injunction shall issue out of and under the seal of this Court, enjoining defendants and each of them, their officers, associates, attorneys, employees, servants and those in active concert or participation with them, and each of them, from in any manner manufacturing, using or selling, or offering for sale, dispenser cathodes or electron tubes containing any of said cathodes coming within the scope of one or more claims of U. S. Patent Nos. 2,700,118, 2,700,000 and/or 3,201,639, except where the U. S. Government authorizes or consents to infringement of such patents or U. S. Philips licenses such infringement.

11. The infringements by defendants were not willful or intentional, and none of the defendants shall be required to pay increased damages or the fees of plaintiff's attorneys.

12. Defendant Spectra-Mat has the burden of proving the issues, including those of fraud, anti-trust and patent misuse, raised by its counterclaims, but it has failed to meet this burden. Said counterclaims are completely lacking in both factual and legal support, and they are dismissed with prejudice.

13. Plaintiffs are entitled to their costs herein.

## FINAL JUDGMENT

This cause, having come on for trial before this Court, witnesses for both sides having been heard, documentary and physical exhibits having been re-

ceived in evidence, and the Court having heard final arguments on the facts and the law and having made its Findings of Fact and Conclusions of Law,

It is hereby ordered, adjudged and decreed, as follows:

1. The Court has jurisdiction of the parties and the subject matter of the action.

2. Plaintiff, U. S. Philips Corporation, is a corporation of Delaware with offices at 100 E. 42nd Street, New York, New York.

3. Original plaintiff, North American Philips Company, Inc., is no longer in existence.

4. Defendant Watkins-Johnson Company, is a corporation of California with offices at 3333 Hillview Avenue, Palo Alto, California; said defendant Watkins-Johnson Company is the successor by merger of defendant, Stewart Engineering Company.

5. Defendant, Spectra-Mat, Inc. is a corporation of California with offices at 1240 Highway 1, Watsonville, California.

6. Plaintiff U. S. Philips is the sole owner of the three patents in suit, with the right to recover for infringement thereof.

7. Defendants have the burden of proving that United States Patents No. 2,700,118, No. 2,700,000 and No. 3,201,639 are invalid or unenforceable, but they have failed to meet this burden. Said patents describe and claim inventions which satisfy all the requirements of 35 U.S.C. §§ 101–103 of utility, novelty and non-obviousness, and said patents are each good and valid in law and are enforceable against infringers thereof.

8. Claims 1, 2, 3 and 4 of U. S. Patent No. 2,700,118 are infringed by the dispenser cathodes manufactured and sold by defendant Spectra-Mat under the designations of SM29–50280, SM29–54280, SM29–41180 and SM29–31180; and said claims are infringed by the use of such dispenser cathodes in electron tubes manufactured or sold by the remaining defendants which contain any of said cathodes.

9. Claims 1, 2, 5, 6, 7 and 9 of U. S. Patent No. 2,700,000 are infringed by the dispenser cathodes manufactured and sold by defendant Spectra-Mat under the designations SM29–50280, SM29–53280, SM29–41180 and SM29–31180; and said claims are infringed by the use of such dispenser cathodes in electron tubes manufactured or sold by the remaining defendants which contain any of said cathodes.

10. Claims 3, 4, 10, 11, 12, 13 and 14 of U. S. Patent No. 2,700,000 are infringed by defendant Spectra-Mat's methods for the manufacture of its aforesaid cathodes.

11. Claims 1, 2, 5, 6, 7, 15, 16 and 17 of U. S. Patent No. 3,201,639 are infringed by the dispenser cathodes manufactured and sold by defendant Spectra-Mat under the designations SM29–53280, SM29–41180 and SM29–31180; and said claims are infringed by the use of such dispenser cathodes in electron tubes manufactured or sold by the remaining defendants which contain any of said cathodes.

12. Claims 8, 9, 10, 11, 12, 13 and 14 of U. S. Patent No. 3,201,639 are infringed by defendant Spectra-Mat's methods for the manufacture of its aforesaid cathodes.

13. Cathodes manufactured by defendant Spectra-Mat under designation SM29–50280 do not contain calcium, strontium or magnesium oxide and thus they do not infringe U. S. Patent No. 3,201,639.

14. Plaintiff U. S. Philips shall recover from defendants all damages which it or its predecessor plaintiff North American Philips have sustained from defendants aforesaid infringements of its patents, except where the U. S. Government has authorized or consented to infringement of such patents. The matter of damages shall be determined by a separate trial before the Court, after the issues of validity and infringement have been finally disposed of by appeal or otherwise.

14a. The aforesaid infringements by defendants were not willful or intentional and therefore none of the defendants shall be required to pay increased damages or the fees of plaintiff's attorneys.

15. A Writ of Injunction shall issue out of and under the seal of this Court, enjoining defendants and each of them, their officers, associates, attorneys, employees, servants and those in active concert or participation with them, and each of them, from in any manner manufacturing, using or selling, or offering for sale, dispenser cathodes or electron tubes containing any of said cathodes coming within the scope of one or more claims of U. S. Patent Nos. 2,700,118, 2,700,000 and/or 3,201,639, except where the U. S. Government authorizes or consents to infringement of such patents or U. S. Philips licenses such infringement.

16. Defendant Spectra-Mat has the burden of proving the issues raised by its counterclaims but it has failed to meet this burden. Said counterclaims are completely lacking in both factual and legal support. They are dismissed with prejudice.

17. Plaintiffs are entitled to their costs herein. Said costs are to be determined by the Court upon presentation of a Bill of Costs within 15 days after the issues of validity, infringement and damages have been finally disposed of by appeal or otherwise.